## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 02 2020, 12:35 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anthony C. Lawrence
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jacob R. Kovalsky
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent–Child Relationship of: T.R. and M.R. (Minor Children)<br><br>and<br><br>A.R. (Mother),<br><br>*Appellant-Respondent,*<br><br>*v.*<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | April 2, 2020<br><br>Court of Appeals Case No. 19A-JT-2472<br><br>Appeal from the Madison Circuit Court<br><br>The Hon. G. George Pancol, Judge<br><br>Trial Court Cause Nos. 48C02-1902-JT-49 48C02-1902-JT-50 |

**Bradford, Chief Judge.**

# Case Summary

[1] T.R. and M.R. (collectively, "the Children") were born in March of 2014 and March of 2017, respectively, to A.R. ("Mother") and B.R.[1] ("Father") (collectively, "Parents"). In August of 2017, while Father was incarcerated, the Indiana Department of Child Services ("DCS") took custody of the Children because Mother had left them for several days with an acquaintance while she, it was suspected, used illegal drugs. As it happened, Father would remain incarcerated for the duration of this case. The juvenile court found the Children to be children in need of services ("CHINS") and ordered Parents to participate in several services. At first, Mother exhibited partial compliance with some services, but this did not last.

[2] In the end, Mother completed none of the ordered services, tested positive for illegal drugs several times, missed several scheduled drug screens, and caused visitation to be suspended permanently due to her non-compliance. In February of 2019, DCS filed a petition to terminate Parents' rights to the Children ("the TPR Petition"). Following a hearing, the juvenile court granted DCS's petition. Mother contends that the trial court erred in concluding that the conditions that led to the Children's removal and continued placement in foster care would likely not be remedied and that termination of her parental rights is in the Children's best interests. Because we disagree, we affirm.

---

[1] Father does not participate in this appeal, and our treatment of the facts will therefore focus on Mother. We note, however, that Father was incarcerated throughout the pendency of this case below.

# Facts and Procedural History

[3] T.R. and M.R. were born on March 3, 2014, and March 18, 2017, respectively, to Parents. On August 22, 2017, DCS took custody of the Children and filed a petition alleging that they were CHINS because Mother had left them with an acquaintance she had only known for five weeks and had not returned for several days. It was thought that substance abuse was the cause of Mother's neglect, and Father was incarcerated at the time. On November 14, 2017, Mother admitted the allegations in the CHINS petition, and the juvenile court found the Children to be CHINS.

[4] On December 13, 2017, the juvenile court conducted a dispositional hearing, after which it ordered Mother to participate in supervised visitation, home-based casework, random drug screens, a substance-abuse assessment, parenting education, and home-based therapy. On January 31, 2018, the juvenile court held a review hearing, after which it found, *inter alia*, that (1) both parents had partially complied with the Children's case plan; (2) Mother had begun individual counseling but had postponed her parenting assessment, family counseling, and psychological evaluation; (3) Mother had been meeting with her home-based caseworker; (4) Mother had completed her substance-abuse assessment but had only completed two out of fourteen random drug screens; (5) both Parents had enhanced their ability to fulfill their parenting responsibilities; (6) Mother had supervised visitation with the Children for a total of eight hours a week; and (7) both Parents had cooperated with DCS. The juvenile court set the matter for a permanency hearing on August 15, 2018.

[5]     Mother's partial compliance with court-ordered services was not to last. On August 15, 2018, the juvenile court held a permanency hearing, after which the juvenile court found, *inter alia*, that (1) Parents had not complied with the Children's case plan; (2) Mother had not successfully completed or maintained compliance with any service, all of which had been cancelled by the providers; (3) Mother had tested positive for methamphetamine on a day she visited with the Children; (4) Mother had relapsed on illegal drugs and was incarcerated by the end of May of 2018; and (5) Mother's visitation had been temporarily suspended due to no-shows and cancellations. On September 5, 2018, the juvenile court appointed Natalie Bogan as a court-appointed special advocate ("CASA Bogan") to represent the Children's interests. Visitation was also reinstated at some point in September of 2018.

[6]     On February 13, 2019, the juvenile court conducted a hearing, after which it found, *inter alia*, that (1) Parents had not complied with the case plan; (2) with the exception of a substance-abuse evaluation in 2017, Mother had failed to complete any services; (3) T.R.'s therapist Shayla Irby and CASA Bogan recommended cessation of visitation with Mother; (4) Parents had not enhanced their ability to fulfill their parental obligations; (5) Mother had been closed out of visitation due to positive drug screens, failing to confirm visitations, leaving early, no-shows, and visitation being traumatic for the Children; (6) Parents had not cooperated with DCS; and (7) the cause of removal had not been alleviated. The same day, the juvenile court approved a concurrent permanency plan for the Children of reunification and adoption.

[7] On February 19, 2019, DCS filed a TPR petition. On July 23, 2019, the juvenile court began a hearing on the TPR Petition, which hearing was continued on August 8 and 13, 2019. Irby testified that she had been working with T.R. since November of 2018 and that T.R. had exhibited aggressive behavior, resistance to her foster parents, and bed-wetting after visits from Mother. T.R.'s behaviors improved, however, when visitation was permanently suspended in December of 2018. Irby indicated her belief that further trauma could be avoided if Parents' rights were terminated, and she agreed with that course of action.

[8] Dwayne Wade, who supervised Mother's visitation with the Children from September of 2018 until its cessation in December of 2018, testified that while Mother's visitation was initially consistent, that consistency did not last. Visitation was cancelled October 17 and 24, 2018, due to Mother's failure to confirm the appointments as directed. Moreover, Mother missed five straight visitations in late November to early December of 2018. Mother later claimed that she had been in a drug rehabilitation program at the time, but that turned out to be untrue, as she had only spent one day in the program. Mother attended two more visits in mid-December, but visitation was suspended permanently after she missed the next three scheduled visits. Wade testified that inconsistency in visitation could have a detrimental effect on children in general and that Mother's inconsistency was particularly traumatic for T.R. When asked if termination of Parents' parental rights was in the Children's best

interests, Wade replied that he felt like the Children would "be in a better place if they are in a more consistent atmosphere." Tr. Vol. II p. 156.

[9] CASA Bogan testified that the Children had bonded with their foster parents and were healthy, happy, and safe in their current placements. CASA Bogan opined that any change in status would jeopardize the Children's stability and that it was in their best interests that Parents' rights to them be terminated.

[10] FCM Katherine Briney, who took over the Children's cases in February of 2018, testified that she was unable to confirm that Mother had attained stable housing or employment due to Mother's poor communication. FCM Briney testified that Mother's visitations had been cancelled in December of 2018, her parenting education had been cancelled in December of 2018, her home-based casework had been closed in October of 2018, and Mother had not been consistent in providing samples for drug screens. FCM Briney confirmed that Mother's three latest drug screens had been positive for multiple illegal substances. Toxicologist Dr. Deborah Coy elaborated, testifying that Mother had tested positive for methamphetamine, 6-acetymorphine, and morphine on November 19, 2018; 6-acetymorphine, morphine, methadone, and fentanyl on December 12, 2018; and amphetamine, methamphetamine, morphine, fentanyl, norfentanyl, and tramadol on March 19, 2019.

[11] FCM Briney opined that the reason for the removal of the Children and their continued placement outside the home had not been remedied because Parents had shown through their habitual patterns to be incapable of providing the stability that the Children need and deserve. FCM Briney also opined that

continuation of the parent–child relationship posed a threat to the Children because they had established a sense of security and safety in their foster placement and it would be traumatic to return them to a situation that had not been proven to be stable and safe. FCM Briney testified that the current plan for the Children was adoption by their current foster parents, a placement in which she believed the Children to be doing "fantastic." Tr. Vol. II p. 214. Finally, FCM Briney opined that it was in Children's best interests that the parent–child relationship with Parents be terminated.

[12] Brandon Dake, one of the Children's foster fathers, testified that T.R. had behavioral problems when Mother still had visitation, including bed-wetting and tantrums, problems that worsened when Mother missed visits and improved when visitation was suspended. Dake and his husband had also addressed preexisting medical issues when they assumed care of the Children, *i.e.*, the back of M.R.'s head had been flat, and T.R. had had a lazy eye and eighty-percent tooth decay; both of T.R.'s conditions had required corrective surgery. According to Dake, he and his husband had bonded with the Children, and they, in turn, had bonded with the other foster child in the couple's care. Dake and his husband hoped to adopt the Children, and Dake opined that termination of Parents' rights was in the Children's best interests.

[13] On August 13, 2019, Mother testified that she was currently incarcerated, facing charges of methamphetamine possession, possession of a controlled substance, false informing, marijuana possession, and paraphernalia possession. Mother also confirmed that she had prior convictions for three counts of theft

and had pled guilty to Level 6 felony methamphetamine possession and Level 6 felony unlawful possession of a syringe on April 16, 2019, convictions for which she had been given an aggregate suspended sentence of two years and 168 days.

[14] On September 23, 2019, the juvenile court granted DCS's TPR petition in an order providing, in part, as follows:

> 30.) From the specific evidence presented through testimony and documents, this Court categorically finds that in regards to Mother:
>
> a. She has failed to achieve or sustain any period of sobriety since the opening of the CHINS proceedings.
>
> b. She failed her last 3 drugs screens submitted to, she was arrested in June for drug charges, and chose to remove herself from an inpatient rehabilitation facility after only one day.
>
> c. She was closed out of all other services due to non-compliance.
>
> d. The evidence showed that her inconsistent visits were harming the Children, in particular it caused [T.R.] to bed wet and have disruptive behavioral issues.
>
> e. She has not had contact with her Children since visitation was cancelled at the end of December 2018 and she could possibly be ordered to serve the remaining suspended sentence from her previous arrests, causing contact with her children to be delayed further.
>
> f. The conditions resulting in the Children's removal from the Mother's home and care have not been remedied. The children were removed because of

Mother's absence and substance abuse and they remain out of her care because of the same.

[….]

32.) The previous recitation of found facts and inferences, both in specific detail and by general category, lead directly to the factual finding, now made, that there is a reasonable probability that the continuation of the parent–child relationship between the Children and [P]arents pose a threat to the well-being of the [C]hildren. The Court finds:

    a.    Shayla Irby, [T.R.]'s therapist, stated the lasting of effects of childhood trauma can follow the Children through the rest of their lives.

    b.    Children's brains are still developing at their age and trauma can hinder that development and cause maladaptive behaviors such as: a higher susceptibility to victimhood in the future, a potential to be a perpetrator as an adult, a decreased ability to bounce back from life's struggles, and a decreased resiliency for living a healthy lifestyle.

    c.    The Children will face additional trauma, if removed from their Foster parent's home, visitation is started and becomes inconsistent, or the Children continue to bond with their Foster parents only to be removed at [a] later date due to the Parent[s'] documented inability to avoid drug use and the criminal justice system.

33.) The Children have been removed from the home and care of their Parents since August of 2017, a time period of approximately twenty five (25) consecutive months through the date of this order. The Children have resided with their current pre-adoptive foster family for the entirety of the 25 months. The Children know this family as their own. The Children have positively responded to the stability and structure, as well as the love and nurturing, provided by the family.

34.) The Children's DCS case manager, therapist, supervised visitation worker, CASA, and foster father have all testified that the termination of the parent–child relationship and adoption of the Children are in the Children's best interest. The Court agrees with these opinions, and now accepts and adopts them as its own finding of fact in these proceedings.

Order pp. 14, 15.

# Discussion and Decision

[15] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent–child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Therefore, parental rights are not absolute and must be subordinated to the children's interest in determining the appropriate disposition of a petition to terminate the parent–child relationship. *Id.*

[16] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes

findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.* In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

[17]     Indiana Code section 31-35-2-4(b)(2) governs what DCS must allege and establish to support the termination of parental rights, and for purposes of our disposition that was:

> (A) that [t]he child has been removed from the parent for at least six (6) months under a dispositional decree[;]
>
>      [….]
>
> (B) that [t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[;]
>
>      [….]
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Mother contends that the juvenile court's erred in concluding that there is a reasonable probability that the conditions that

resulted in the Children's removal or the reasons for placement outside Parents' home will not be remedied and termination is in the Children's best interests.

# I. Indiana Code Section 31-35-2-4(b)(2)(B)(i)

[18] Mother argues that DCS has failed to establish that there is a reasonable probability that the reasons for the Children's continued removal would not be remedied. In making such a determination, a juvenile court engages in a two-step inquiry. First, the juvenile court must "ascertain what conditions led to their placement and retention in foster care." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). After identifying these initial conditions, the juvenile court must determine whether a reasonable probability exists that the conditions justifying the children's continued "placement outside the home will not be remedied." *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (citation omitted), *trans. denied*. The statute focuses not only on the initial reasons for removal "but also those bases resulting in continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. In making this second determination, the juvenile court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re D.D.*, 804 N.E.2d at 266. DCS need not rule out all possibilities of change; rather, it must establish that there is a reasonable probability that the parent's behavior will not change. *In re B.J.*, 879 N.E.2d 7, 18–19 (Ind. Ct. App. 2008), *trans. denied*.

[19] Here, the reason for the Children's removal was Mother's abandonment of them to the care of an acquaintance of short duration for several days so that

she (it was suspected) could do drugs. Since the Children's removal, Mother's substance-abuse issues, if anything, have worsened. In the early months of the CHINS case, Mother completed only two out of fourteen requested drug screens. In November of 2018, Mother left a drug-rehabilitation program after one day. Mother's last three drug screens in November and December of 2018 and March of 2019 demonstrate Mother's ongoing use of illegal substances, including methamphetamine, 6-acetymorphine, morphine, methadone, fentanyl, amphetamine, norfentanyl, and tramadol.

[20] Mother's issues have led to criminal charges as well: in April of 2019, Mother pled guilty to methamphetamine possession and unlawful possession of a syringe and was given a suspended sentence of over two years. At the time of the termination hearing, Mother was incarcerated following her June of 2019 arrest for four additional drug-related charges and was facing possible imposition of the suspended sentence from her April case. In short, the record demonstrates a reasonable probability that Mother's substance-abuse issues will not be resolved any time soon.

[21] Mother, citing her own testimony, argues that she had been "clean" for four months at the time of termination, completed "EOP" and a step-down program, worked with a home-based care provider, completed a parenting class on her own, attended NA, maintained a home, had employment available after her release, and "felt she was making progress." Appellant's Br. p. 12. Mother's arguments amount to nothing more than requests to reweigh the evidence, which we will not do. *In re S.P.H.*, 806 N.E.2d at 879. The juvenile

court did not clearly err in concluding that the reasons for the Children's removal and continued placement in foster care were not likely to be remedied.

## II.  Indiana Code Section 31-35-2-4(b)(2)(C)

[22]   Mother also argues that the juvenile court erred in concluding that termination of her parental rights was in the Children's best interests.  We are mindful that, in determining what is in the best interests of the Children, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence.  *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).  In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved.  *Id*.  Furthermore, this court has previously determined that the testimony of a GAL regarding a child's need for permanency supports a finding that termination is in the child's best interests.  *In the matter of Y.E.C.*, 534 N.E.2d 273, 276 (Ind. Ct. App. 1992).  Here, T.R.'s therapist, the visitation supervisor, the FCM, the CASA, and the Children's foster father all testified that termination was in Children's best interests.  While this testimony is likely more than enough to support the juvenile court's conclusion to that effect, it is not as though this evidence stands alone.

[23]   As mentioned, there is ample evidence to support a conclusion that Mother is in the throes of addiction such that she is either unwilling or unable to place the needs of the Children before her need to get high.  Mother's failures to complete any ordered services and maintain regular visitation, as well as her recent criminal convictions and charges, seem to be directly attributable to her

substance abuse, and there is little in the record to suggest that the situation will improve any time soon. Several witnesses, unsurprisingly, testified that it would be detrimental to the Children to be placed back into that environment.

[24] The juvenile court also heard a great deal of evidence that the Children were thriving with their foster family, including evidence that the Children were bonded to them, the Children's previous medical issues had been addressed, and T.R. was doing "[a]mazing" in kindergarten. Tr. Vol. III p. 7. Indeed, the Children already refer to at least one of their foster fathers as "Daddy" and to their foster brother as "bubby[.]" Tr. Vol. III. p. 9. In light of the evidence of Mother's failure to address her substance abuse and the very positive nature of the Children's pre-adoptive placement, we conclude that the record contains more than enough evidence to support the juvenile court's conclusion that termination was in the Children's best interests.

[25] The judgment of the juvenile court is affirmed.

Baker, J., and Pyle, J., concur.